UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| MAUI LAND & PINEAPPLE CO., INC., <br><br> Plaintiff, <br><br> vs. <br><br> LIBERTY INSURANCE UNDERWRITERS INC., A NEW YORK CORPORATION; JOHN DOES 1-20, JANE DOES 1-20, DOE ENTITIES 1-20, DOE INSURANCE ENTITIES 1-20, <br><br> Defendants. | CIV. NO. 16-00271 DKW-KJM <br><br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT LIBERTY INSURANCE UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF MAUI LAND & PINEAPPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This insurance coverage dispute arises out of a residential development project located in West Maui, funded and controlled, in part, by Plaintiff Maui Land & Pineapple Company ("MLP"). Before the Court are (1) MLP's Motion for Partial Summary Judgment ("MPSJ") on both its Complaint for Declaratory Judgment and on Defendant Liberty Insurance Underwriter's Counterclaim for the same; and (2) Liberty's Motion for Summary Judgment ("MSJ") on its Counterclaim for the same (collectively "Cross-MSJs"). For the reasons set forth below, Liberty's MSJ (Dkt. No. 62) and MLP's MPSJ (Dkt. No. 64) are GRANTED IN PART AND DENIED IN PART.

**I.    Underlying Lawsuit**

On June 7, 2012, a group of litigants ("Underlying Plaintiffs") commenced an action against twenty-two defendants—including MLP and Ryan L. Churchill—in the Circuit Court of the Second Circuit, State of Hawai'i, *Narayan, et. al. v. Marriott Int'l, Inc., et al.*, Civil No. 12-1-0586(3) ("Underlying Lawsuit"). The Underlying Lawsuit concerns a residential development project formerly known as The Ritz-Carlton Club & Residences in Kapalua Bay, Maui, Hawaii (the "Project"). *See* Esaki Decl., Ex. A [Second Am. Compl. in Underlying Lawsuit] ¶ 1, Dkt. No. 65-2 [hereinafter Underlying SAC].

According to the Underlying Plaintiffs, MLP "directly or indirectly through wholly owned subsidiaries exerts control" over defendant in the Underlying Lawsuit, Kapalua Bay, LLC (Underlying SAC ¶ 26(d)), which is a "Delaware limited liability company" ("LLC") that was "created by a joint venture between Marriott International, Inc. ([which has a] 34% [joint-venture interest]), MLP (51%), and Exclusive Resorts, LLC (15%)" (Underlying SAC ¶ 20). "Kapalua Bay is 'member driven' in that no major decision can be made without both Marriott and [MLP]'s agreement and/or consent." Underlying SAC ¶ 20, Dkt. No. 65-2. MLP "exerts control" in a variety of ways, including via Churchill, who is "a senior executive officer of [MLP], President of Kapalua Bay, an officer of

Kapalua Bay Holdings, the 'point person' for the Joint Venture, and an executive officer of Kapalua Realty" who " participated in all aspects of the Project, including financing, development, construction, pricing, marketing and sales and was one of [MLP]'s two representatives" on the Association of Apartment Owners of Kapalua Bay Condominium ("AOAO") Board.  Underlying SAC ¶¶ 26(d), 38.

In their Second Amended Complaint filed June 13, 2013, Underlying Plaintiffs bring nine Counts against the defendants in the Underlying Lawsuit, including: (i) "Breach of Fiduciary Duty (Against All Defendants)" (Underlying SAC ¶¶ 96–99, Dkt. No. 65-2); (ii) "Access to Books and Records of the Association (Against All Defendants)" (*id.* ¶¶  100–01); (iii) "Injunctive/Declaratory Relief (Against All Defendants)" (*id.* ¶¶ 102–03); (iv) "Unfair and Deceptive Acts and Practices (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 104–07); (v) "Intentional Misrepresentation and/or Concealment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 108–14); (vi) "Negligent Misrepresentation and/or Concealment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 115–21); (vii) for "Violations of Hawaii Condominium Statute—[Hawaiʻi Revised Statutes ('HRS')] Chapter 514B, or, to the extent applicable, HRS Chapter 514A (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id*. ¶¶ 122–24); (viii) "Unjust Enrichment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id*.

3

¶¶ 125–30); and (ix) "Civil Conspiracy (By All Purchaser Plaintiffs Against All Developer Defendants)" (*id.* ¶¶ 131–33). The "Developer Defendants" include MLP, Kapalua Bay, and other entities, but do not include individuals like Churchill. *See* Underlying SAC ¶ 32, Dkt. No. 65-2.

In the allegations supporting the claim for breach of fiduciary duty, the Underlying Plaintiffs assert the following:

> 92. Inasmuch as every past and present director on the AOAO Board is employed by and/or is an agent for the joint venture entities that control and hold the beneficial interests in Kapalua Bay, each has conflicts of interest. Consequently, these directors have not reasonably exercised the fiduciary duties that they owe to Plaintiffs and other owners, and must be precluded from taking any action regarding the management of the Project or the expenditure of Association funds except to the specific extent agreed to by Plaintiffs. The Plaintiffs and other independent owners must be allowed to access the information held by the Board to meaningfully participate in the Board's deliberations and actions.

> 93. The conflicted directors and managing Agent have already breached their fiduciary duties to the Association and to the owners by, *inter alia*, failing to timely inform Plaintiffs or to otherwise take action regarding the dire financial condition of the Project, failing to take any action to compel the joint venture to make the payments owed by Kapalua Bay, failing to stop MVW/MORI and/or Marriott from stripping funds out of the Association's accounts, intentionally keeping the owners in the dark regarding the current situation, failing to adequately respond to the owners' requests for information, and failing to exercise oversight duties with respect to the operation of the Project and the cost thereof, particularly since Marriott's management fee was 10% of the total cost to run the Project thereby incentivizing Marriott *et al* to make the Project operations as expensive as possible.

4

. . . .

> 97. Defendants owe fiduciary duties, including duties of utmost good faith, loyalty, full disclosure, and care to Plaintiffs. By their acts and omissions, both directly, through their respective affiliated entities, and through the representatives that served as directors on the Board, Defendants have breached these duties, consistently failing to act in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that one would reasonably believe to be in the best interests of the Association and Plaintiffs.

Underlying SAC ¶¶ 92, 93, 97, Dkt. No. 65-2. Several allegations in the Underlying SAC also name Churchill individually and describe his alleged material misrepresentations to Underlying Plaintiffs regarding the Project's financing. *E.g.*, Underlying SAC ¶¶ 62 ("Churchill . . . misrepresented to prospective purchasers that Ritz-Carlton and Marriott were fully committed to the Project."); 65 ("The Statements made by Mr. Churchill . . . regarding the strength of the Developer and the commitment of the [joint venture] partners were false and deceptive."); 66 (discussing Churchill's specific misrepresentations to, and material omissions from, an Underlying Plaintiff in 2009); 67 (describing Churchill's misrepresentations, as part of the "Ritz-Carlton sales staff," in connection with an Underlying Plaintiff's purchase of a unit at the Project); 68 (alleging misrepresentations and material omissions based on conversations with Churchill and another "between the end of 2010 and the close of [the Underlying

Plaintiff's] purchase in August of 2011"); 69 (describing alleged misrepresentations stemming from discussions with Churchill and others prior to the closing of an Underlying Plaintiff's unit in May 2010). Underlying Plaintiffs also allege that the AOAO Board was itself wrongful in failing to engage in effective financial oversight of the Project. Underlying SAC ¶ 82, Dkt. No. 65-2.

After years of litigation—including appeals reaching the Supreme Court of the United States—the Hawaiʻi Supreme Court affirmed the denial of a motion to compel arbitration by defendants in the Underlying Lawsuit and "remand[ed] the case to the circuit court for further proceedings" on July 14, 2017. *Narayan v. The Ritz-Carlton Dev. Co., Inc.*, 400 P.3d 544, 547, *recon. denied*, 400 P.3d 581 (Haw. 2017), and *cert. denied*, No. 17-694, --- S. Ct. --- (2018).

## II.    Contracts & Insurance Documents

The Cross-MSJs before the Court implicate the parties' various insurance and other agreements, the relevant portions of which are described below.

*MLP–Churchill Indemnification Agreement*

On August 3, 2009, MLP entered into an Indemnification Agreement (Dkt. No. 65-8) with its then-"officer and/or director" Churchill. Section 2 of the Indemnification Agreement obligates MLP to indemnify Churchill for costs "actually and reasonably incurred by [Churchill] in connection with a Proceeding . . . if [Churchill] acted in good faith and in a manner [Churchill] reasonably

6

believed to be in or not opposed to the best interests of [MLP][.]"  Indemnification

Agreement § 2(a), Dkt. No. 65-8 at 2.  "[MLP] shall not be obliged" under the

agreement, however, "[t]o indemnify [Churchill] for Expenses or liabilities of any

type whatsoever . . . which have been paid directly to or on behalf of [Churchill] by

an insurance carrier under a policy of directors' and officers' liability insurance

maintained by [MLP] . . . ."  Indemnification Agreement § 3(d), Dkt. No. 65-8 at 3.

MLP is also obligated to "use its best efforts to obtain and maintain, or have an

affiliate obtain and maintain, in full force and effect directors' and officers'

liability insurance . . . which provides [Churchill] the same rights and benefits as

are accorded to the most favorably insured of [MLP]'s directors."  Indemnification

Agreement § 8(a), Dkt. No. 65-8 at 3.  The insurance policy described below is

MLP's effort to fulfill this obligation.

### Liberty–MLP Executive Advantage Policy

Liberty issued an Executive Advantage insurance policy to Churchill and

MLP, Policy No. DOSF-190257-210 (the "Policy"), that spans the policy period

from September 1, 2011 to September 1, 2012.  *See* Policy, Dkt. Nos. 10-4 at 1–21

(Part 1), 10-5 at 1–21 (Part 2).  The Policy generally obligates Liberty to provide

coverage to "Insured Persons" for "all Loss which they shall become legally

obligated to pay as a result of a Claim" and to "Insured Organizations" for "all

Loss which it is permitted or required by law to indemnify the Insured Persons as a

result of a Claim" so long as the claim is "first made during the Policy Period . . .

against the Insured Persons for a Wrongful Act which takes place before or during

the Policy Period[.]"  Policy §§ 1.1 (Insured Persons), 1.2 (Insured Organizations),

*as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2.  The Policy also provides

MLP with coverage for its own wrongful conduct occurring "as a result of a

Securities Action."  Policy § 1.3, *as amended by* Endorsement No. 9, Dkt. No. 10-5

at 2–3.

      With respect to the costs of defending against a legal action, the Policy

provides both that "[i]t shall be the duty of the Insureds, not [Liberty], to defend

any Claim" (Policy § 3.1, Dkt. No. 10-5 at 3), and that Liberty "shall not be liable

for any Defense Costs incurred or any admissions, obligations, agreements, or

settlements made by the Insureds without [Liberty]'s prior written consent" (Policy

§ 3.2, Dkt. No. 10-5 at 3).  Moreover, "[Liberty] shall . . . advance on a current

basis covered Defense Costs incurred by the Insureds" (Policy § 3.3, Dkt. No. 10-5

at 3), and "Insured Organizations agree to indemnify the Insured Persons and/or

advance Defense costs to the fullest extent permitted or required by law" (Policy

§ 11.2, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7 (stating further that

"If [Liberty] pays under this Policy any indemnification or advancement owed to

any Insured Person by an Insured Organization within the applicable Retention,

then that Insured Organization shall reimburse [Liberty] for such amounts and such

amounts shall become immediately due and payable as a direct obligation of the Insured Organization to the Insurer")).  *Defense Costs* are "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a Claim and cost of attachment or similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers, or employees of the Insured Organization[.]"  Policy § 25.4(a), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 9.

Under "Exclusions," the Policy specifies that coverage does not include "any error, misstatement, misleading statement, act, omission, neglect or breach of duty by any Subsidiary or such Subsidiary's Insured Persons if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a Subsidiary."  Policy § 5.2, Dkt. No. 10-4 at 5.  The Policy also excludes coverage for any Loss "based upon, arising from, or in any way related to an Insured Person serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the Insured Organization[.]"  Policy § 5.8, Dkt. No. 10-4 at 6 [hereinafter Outside Service Exclusion].  Coverage for losses "based upon, arising from, or in any way related to any deliberately fraudulent act or omission or any willful violation of law by any Insured if a final judgment or other final adjudication in the underlying action against Insured establishes such an act,

omission, or willful violation" is also excluded.  Policy § 5.10, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 5.

And with regard to "Allocation," the Policy specifies that where "a Claim gives rise to Loss covered under this Policy and loss not covered under this Policy, either because a Claim includes both covered and uncovered matters or both covered and uncovered parties," Liberty and the Insureds will "use their best efforts to determine a fair and appropriate allocation" of funds.  Policy § 13.1, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7.  "If there can be no agreement between [Liberty] and the Insured as to the amount of Defense Costs to be advanced in connection with any such Claim, [Liberty] shall advance Defense Costs which it reasonably believes to be covered under this Policy until a different allocation is negotiated or determined."  Policy § 13.2, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7.

## III.  <u>Procedural Background</u>

MLP initiated the instant lawsuit in the Circuit Court of the Second Circuit, State of Hawaiʻi, on May 6, 2016.  *See* Notice of Removal, Ex. 1 [Compl. for Declaratory J.] at 2–6, Dkt. No. 1-1.  Liberty removed the case to this Court on May 31, 2016 (Dkt. No. 1) and filed its Answer to MLP's claims on June 7, 2016

(Dkt. No. 6).[1]

The parties filed their Cross-MSJs on October 11, 2017. Liberty MSJ, Dkt. No. 62; MLP MPSJ, Dkt. No. 64. Liberty seeks summary judgment against MLP arguing that the Policy does not entitle MLP to coverage in the Underlying Lawsuit. Liberty MSJ, Dkt. No. 62. Liberty principally asserts that because the Underlying Plaintiffs have sued Churchill for breaching duties owed *in Churchill's capacity as director of the AOAO*, rather than in his capacity as an officer of MLP, the Outside Service Exclusion is triggered. *See* Liberty Mem. in Supp. of MSJ at 10–13, 17–23, Dkt. No. 62-3. Liberty additionally contends that because Underlying Plaintiffs are condominium owners/purchasers, rather than shareholders to whom certain securities-based fiduciary duties would be owed, the Underlying Lawsuit is not a "Securities Action" for which the Policy provides coverage to MLP. *See* Liberty Mem. in Supp. at 16–17, Dkt. No. 62-3. In MLP's MPSJ (Dkt. No. 64), MLP seeks advanced defense costs and a declaration of indemnity regarding the Underlying Lawsuit. In support, MLP asserts that it has "a prima facie claim that the Underlying Lawsuit is covered by the Policy" and "leaves Liberty to its proof as to any policy exclusions" that may apply. MLP Mem. in Supp. of MPSJ at 14, Dkt. No. 64-1.

---

[1] MLP moved to remand the case on June 29, 2016. Mot. to Remand, Dkt. No. 10. But on August 17, 2016, the Magistrate Judge issued its Findings and Recommendation to Deny Plaintiff's Motion to Remand ("F&R"; Dkt. No. 18), which this Court adopted over MLP's objection (Dkt. No. 22) on November 10, 2016 (Order Adopting F&R, Dkt. No. 25).

This Court heard oral argument on the Cross-MSJs on December 15, 2017 (*see* EP, Dkt. No. 75) and took matters under advisement. The instant disposition follows.

## LEGAL STANDARDS

### I. Summary Judgment

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citing *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990)).

Once the moving party has satisfied its initial burden of production, the burden shifts to the party opposing summary judgment "to demonstrate the

existence of a genuine dispute."[2] *Kowalski v. Mommy Gina Tuna Res.*, 574 F. Supp. 2d 1160, 1162 (D. Haw. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  To meet this burden, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts" and instead must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec.*, 475 U.S. at 586–87 (citations and internal quotation marks omitted).  At least some "significant probative evidence tending to support the complaint" must be produced.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").  For, if no evidence can be mustered to sustain the nonmoving party's position, a trial would be useless. *See Kahumoku v. Titan Mar., LLC*, 486 F. Supp. 2d 1144, 1150 (D. Haw. 2007) (explaining that one of the primary purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses") (quoting *Celotex*, 477

---

[2]"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins.*, 210 F.3d at 1102–03 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *High Tech Gays*, 895 F.2d at 574; A. Friedenthal, A. Miller, & M. Kane, Civil Procedure 460 (3d ed. 1999)).

U.S. at 323–24 (1986)); *see also Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

Furthermore, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

## II.  <u>Insurance Contracts</u>

Insurance policies are a form of contract and subject to the general rules of contract construction. As such, their terms must be interpreted according to their ordinary, commonly accepted meaning, unless it appears from the language of the policies that a different meaning is intended. *C. Brewer & Co. v. Marine Indem. Ins. Co. of Am.*, 347 P.3d 163, 169 (Haw. 2015) (quoting *Dairy Rd. Partners v. Island Ins. Co.*, 992 P.2d 93, 106 (Haw. 2000)); *accord Dawes v. First Ins. Co. of Haw.*, 883 P.2d 38, 42 (Haw. 1994).

Courts in Hawaiʻi construe insurance policies "liberally in favor of the insured and the ambiguities [are] resolved against the insurer." *Fortune v. Wong*, 702 P.2d 299, 305 (Haw. 1985) (quoting *Masaki v. Columbia Cas. Co.*, 395 P.2d 927, 929 (Haw. 1964)) (additional citations omitted). Moreover, "any ambiguity in an exclusionary clause is construed in favor of the insured and 'strictly construed against the insurer.'" *C. Brewer & Co.*, 347 P.3d at 169 (quoting *Retherford v. Kama*, 470 P.2d 517 (1970)). Nonetheless, the Hawaiʻi Supreme Court has clearly explained that the construction of ambiguities against an insurer does not come into play merely because the insured party alleges ambiguity, nor does it come into play simply because the parties to the dispute disagree about the underlying policy's terms. *See Oahu Transit Servs., Inc. v. Northfield Ins. Co.*, 112 P.3d 717, 722 n.7 (Haw. 2005) (citing *Hawaiian Ins. & Guar. Co., Ltd. v. Chief Clerk*, 713 P.2d 427, 431 (Haw. 1986)). Rather, "[a]mbiguity exists and the rule is followed only when the [underlying insurance policy], taken as a whole, is reasonably subject to differing interpretation." *Id*.

With these basic principles in mind, the Court turns first to the merits of Liberty's MSJ (Dkt. No. 62) and then to MLP's MPSJ (Dkt. No. 64).

# DISCUSSION

## I.    Churchill Coverage

The Court first ascertains whether the Policy provides for the defense of claims against Churchill in the Underlying Lawsuit. It does.

### A.    Standard for the Duty to Advance Defense Costs Under the Policy

According to Liberty, its duty to advance defense costs under the Policy "requires that the insured 'establish that the underlying claims are within the basic scope of coverage,'" and because MLP has not established such coverage, the defense-costs duty has not been triggered. *See* Liberty Reply at 10, Dkt. No. 73-1 (quoting *Jeff Tracy, Inc. v. United States Specialty Ins. Co.*, 636 F. Supp. 2d 995, 1044 (C.D. Cal. 2009)). MLP, on the other hand, asserts that the general standard for triggering the legal duty to defend is the same as the standard to trigger the duty to advance costs under the Policy—potentiality. MLP Mem. in Supp. at 12–14, Dkt. No. 64-1; MLP Reply at 1–8, Dkt. No. 72. And potentiality is evident from the Underlying SAC.

A "duty to defend" under an insurance contract "rests primarily on the *possibility* that coverage exists." *Dairy Rd.*, 992 P.2d at 107 (emphasis added) (quoting *Sentinel Ins. Co., Ltd. v. First Ins. of Haw., Ltd.*, 875 P.2d 894, 904 (Haw. 1994)). "When an insurer has a duty to defend, the 'insurer must defend its insured against claims that create a *potential* for indemnity under the policy." *Legacy*

*Partners, Inc. v. Clarendon Am. Ins. Co.*, 2010 WL 1495198, *4 (S.D. Cal. Apr. 14, 2010) (quoting *Scottsdale Ins. Co. v. MV Transp.*, 115 P.3d 460, 466 (Cal. 2005)); *see also Standard Oil Co. of Cal. v. Hawaiian Ins. & Guar. Co., Ltd.*, 654 P.2d 1345, 1349 (Haw. 1982) ("The possibility may be remote[,] but if it exists[,] the [insurer] owes the insured a defense." (quoting another source)). An insurer's duty to defend thus extends beyond claims where liability within the scope of the policy is ultimately found. *See Finley v. Homes Ins. Co.*, 975 P.2d 1145, 1149–50 (Haw. 1998) ("Where a complaint alleges grounds that are both within and without the scope of insurance coverage, the insurer is required to defend the entire action.") (citing *First Ins. Co. of Haw., Inc. v. State of Haw.*, 665 P.2d 648, 652 (1983)).[3] *Cf. Nautilus Ins. Co. v. Lexington Ins. Co.*, 321 P.3d 634, 644 (Haw. 2014) ("When it comes to the duty to defend, a heavy burden is placed on the insurer if that insurer wishes to disclaim its duty.").

Contrary to Liberty's contention, the Court finds that Ninth Circuit precedent supports application of the potentiality standard for the duty to defend to similar insurance policies that impose a duty to reimburse defense costs on insurers. *See, e.g.*, *Braden Partners, LP v. Twin City Fire Ins. Co.*, 2017 WL

---

[3]The policy rationale for this rule is simple—an insurer who will not defend the entire action would have a conflict of interest with the insured in the underlying action "because the insurer may be more concerned with developing facts showing non-coverage than facts defeating liability." *Finley*, 975 P.2d at 1150 (quoting Douglas Richmond, *Lost in the Eternal Triangle of Ins. Defense Ethics*, 9 Geo. J. Legal Ethics 475, 486 (1996)) (citing *Rockwell Int'l Corp. v. Superior Ct. of Los Angeles*, 32 Cal. Rptr. 2d 153, 158 (Ct. App. 1994)).

63019, *9–10 (N.D. Cal. Jan. 5, 2017) (collecting cases in support). Indeed, "[a]n insurer may have a duty to advance defense costs even if it does not have a duty to defend the insured against an underlying claim." *Id.*, 2017 WL 63019 at *10 (citing *Gon v. First State Ins. Co.*, 871 F.2d 863, 867–68 (9th Cir. 1989) (explaining that, although the insurer did not have a duty to defend under the policy, it nonetheless had a "duty . . . to pay defense expenses as incurred" under the policy's general indemnification provision, which "cover[ed] legal expenses as a loss item"); and *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 279–82 (9th Cir. 1986) (holding that the insurer had a duty to pay defense costs as they were incurred because "[t]he costs of the 'defense of legal actions' [were] included in the definition of 'Loss' [in the policy]")). Indeed, "the duty to advance defense costs would be illusory if the insured had to wait for a determination of actual coverage to obtain the necessary funding for its defense." *Braden Partners*, 2017 WL 63019 at *11 (citing *Gray v. Zurich Ins. Co.*, 419 P.2d 168, 173 (Cal. 1966)).

Courts have held that "the duty to advance defense costs, like the duty to defend, extend[s] to potentially covered claims" where the policy at issue includes "the word 'alleged' when defining the scope of the insurer's duty to advance defense costs[.]" *Braden Partners*, 2017 WL 63019 at *9–10 (explaining that where "the policy require[d] [the insurer] to advance costs incurred defending against 'alleged' wrongdoing," a mere "potential [for] coverage is sufficient to

trigger the duty"); *see also, e.g.*, *Legacy Partners*, 2010 WL 1495198 at *4–5 (explaining that "[t]he [p]olicy's use of the word 'alleged'. . . [was] critical" to the court's analysis because "[a]llegations, by their nature, are not facts," but they "have the *potential* to become facts")); *cf., Peterson v. Columbia Cas. Co.*, 2012 WL 5316352, *10 (C.D. Cal. Aug. 21, 2012) (finding no duty to advance defense costs where the policy at issue did "not compel unconditioned payment of expenses in the manner of those in *Legacy Partners* and *Olympic Club* [*v. Those Interested Underwriters at Lloyd's London*, 991 F.2d 497 (9th Cir. 1993) (not directly addressing the duty-to-advance issue)] and does not reference 'alleged' damages").[4] Here, the Policy does just that.

The Policy generally obligates Liberty to provide coverage to "Insured Persons" for "all Loss which they shall become legally obligated to pay as a result of a Claim," and to "Insured Organizations" for "all Loss which it is permitted or required by law to indemnify the Insured Persons as a result of a Claim" so long as

---

[4]*But see Millennium Labs., Inc. v. Allied World Assurance Co. (U.S.), Inc.*, 2013 WL 12072536, *5 (S.D. Cal. July 22, 2013) (rejecting arguments focused on provisions in the policy stating that certain "alleged" acts are covered, noting that "the policies in *Jeff Tracy*[, 636 F. Supp. 2d 995,] and *Impac* [*Mortg. Holdings, Inc. v. Houston Cas. Co.*, 634 Fed. Appx. 614 (9th Cir. 2016),] also covered 'alleged' acts," and holding that the "potential for coverage" standard did not apply to the standard-type Directors and Officers ("D & O") Liability Policy at issue, which was an "indemnity-only polic[y] whereby the insurer reimburses defense expenditures only after the insured selects counsel, controls the defense, and submits the defense bill") (citing, *inter alia*, *Exec. Risk Indemnity, Inc. v. Jones*, 89 Cal. Rptr. 3d 747, 751 n.4 (Ct. App. 2009) (explaining that "[u]nlike a comprehensive general liability policy, D & O policies are not written on a 'duty to defend' basis" but rather "are indemnity-only policies whereby the insurer reimburses defense expenditures only after the insured selects counsel, controls the defense, and submits the defense bill")).

the claim is "first made during the Policy Period . . . against the Insured Persons for a Wrongful Act which takes place before or during the Policy Period[.]" Policy §§ 1.1 (Insured Persons) & 1.2 (Insured Organizations), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2. A *Wrongful Act* is defined under the Policy as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, actually or allegedly committed or attempted by the Insured Persons in their capacities as such or in an Outside Position . . . ." Policy § 25.20(a), *as amended by* Endorsement No. 4, Dkt. No. 10-4 at 18.

Particularly in light of the liberal public policy resolving doubts regarding the duty to defend against insurers like Liberty, *Sentinel*, 875 P.2d at 904 (citing *Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 812 (11th Cir. 1985)), the Court holds that the standard for triggering the duty to defend under the Policy is the same as the standard for triggering the duty to advance costs—potentiality.[5]

---

[5]MLP says that in opposing MLP's Motion to Remand this case to state court (*see* Mot. to Remand, Dkt. No. 10; Opp'n to Mot. to Remand, Dkt. No. 16 at 13), Liberty acknowledged "that the duty to advance defense costs is determined in the same manner that the Hawaii courts determine the duty to defend." *See* MLP Mem. in Supp. at 13 n.3, Dkt. No. 64-1. MLP alleges that Liberty did so in an effort to show that there were no unresolved issues of state law that this Court could be required to determine and therefore no reason to remand. As such, MLP asserts that "Liberty is judicially estopped from arguing that the traditional duty to defend standard followed by Hawaii courts does not apply in this case[.]" MLP Mem. in Supp. at 13 n.3, Dkt. No. 64-1 (citing *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997)). The Court need not reach MLP's estoppel contention because its finds for MLP on the merits of the potentiality issue.

B. <u>The Underlying Lawsuit Raises the "Potentiality" of Coverage for Churchill Under the Policy</u>

In the Underlying Lawsuit, Churchill is sued both "in his capacity as an officer of MLP" and "in his capacity as a director of the defendant AOAO." *See* MLP Mem. in Supp. at 2 n.2, Dkt. No. 64-1. Accordingly, the allegations in the Underlying Lawsuit raise the possibility of coverage, triggering MLP's duty to advance defense costs.

Liberty has "acknowledged" that it provides excess coverage to Churchill in his capacity as an AOAO director. Liberty, however, declines "to advance[] defense costs to indemnify Churchill and MLP against claims arising from Churchill's conduct in his . . . capacity" as an MLP officer. MLP Mem. in Supp. at 2 n.2, Dkt. No. 64-1. Liberty does so because it argues that no claims have been directed at Churchill in the Underlying Lawsuit in his capacity as an MLP officer. Liberty Mem. in Supp. at 7, 11, Dkt. No. 62-3 (asserting that "[t]he only legal relationship between Mr. Churchill and the Underlying Plaintiffs arose solely from his seat on the condominium association board"; because he was sued as a director of the board, and the Underlying Plaintiffs "assert no claims against him as an officer or director of MLP," Churchill has no coverage under the Policy); *id.* at 17–18 ("There are no allegations of wrongdoing relating to Mr. Churchill's role as an officer of MLP[.]"); *id.* at 22–23 ("As there can be no dispute that the Underlying [SAC] seeks relief based on Mr. Churchill's conduct as an AOAO

21

Director . . . , there also can be no dispute that Mr. Churchill is not entitled to coverage under the Liberty policy[.]").

While Liberty *might* be correct, the Underlying SAC is not so clear. The Underlying Plaintiffs' breach of fiduciary duty claim, for instance, is asserted against *all* defendants. Underlying SAC ¶¶ 32–33, Dkt. No. 65-2. That is consistent with the broad allegations asserted elsewhere in the Underlying SAC. For example, Underlying Plaintiffs allege:

> 41.    Each and all of the Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participating in the conduct, acts, and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more other Defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to the conduct, acts, and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or severally liable for the conduct, acts, and omissions alleged herein.

Underlying SAC ¶ 41, Dkt. No. 65-2. "[A]ll of the Defendants" certainly includes Churchill. That much is clear.

While Liberty wishes to limit these allegations to Churchill in his capacity *as an AOAO Board Member* and not Churchill in his capacity *as an MLP officer and director* by, among other things, arguing that Churchill did not owe a duty to Plaintiffs as an MLP officer or director (*see, e.g.*, Liberty Mem. in Supp. at 17–19, Dkt. No. 62-3), the State court presiding over the Underlying Lawsuit has made no

such finding, nor is it evident in the voluminous materials submitted by the parties that the issue has even been presented to the State court. All this Court has, then, are the allegations of the Underlying SAC, none of which limit the Underlying Plaintiffs' claims against Churchill in the manner urged by Liberty (*compare* Underlying SAC ¶¶ 96–99 ("Against All Defendants"); *with* Underlying SAC ¶¶ 104–32 ("Against All Developer Defendants")), and the other State court litigation statements made by the Underlying Plaintiffs, which offer similarly muted, if any, support (*cf.* Liberty Mem. in Supp. at 17–18, Dkt. No. 62-3; MLP Mem. in Opp'n to Liberty MSJ at 21, Dkt. No. 69).

Indeed, during the December 15, 2017 hearing in this matter, counsel for Liberty argued the allegations in the Underlying Lawsuit "clearly" differentiated between claims against the developers and those claims brought against the AOAO, as evidenced by pages 18 through 21 of the Draft-Conclusions of Law ("Draft-COLs") written by the Underlying Plaintiffs themselves. Tr. of Hr'g at 37, Dkt. No. 76. In relevant part, those Draft-COLs read:

> 6. The developer of a condominium association owes the association a basic fiduciary duty . . . [that] extends to individual homeowners, not just the homeowners' association[.]
>
> 7. . . . [A] developer-controlled association creates a conflict of interest which imposes a fiduciary duty upon the developer . . . when the developer and its employees control the association. Where, as here, the JV Partners in the developer entity have appointed their agents and/or employees as members of the AOAO . . , and the JV Partners thereby control

the AOAO and all other aspects of the development, a basic fiduciary obligation must be imposed on the JV Partners . . . .

. . . .

14.     From the inception of the Project, [MLP] has owed every owner of a unit at the Project a basic fiduciary duty . . . .

15.     The Court finds and concludes that [Underlying] Plaintiffs have demonstrated a likelihood of success on the merits of their claim that [MLP] breached its fiduciary obligations by demonstrating, among other things, that [MLP] . . . . failed to inform its Board appointees that[:] it had written off its investment in the Project by 2009; . . . [and] that the Developer entity would likely be out of money . . . by . . . early 2010 . . . .

16.     . . . [T]he fact that [MLP] had written off its investment in the Project is a material fact that [MLP] and/or its agents were required to disclose to purchasers, owners, and the members of the AOAO Board at the Project.

17.     . . . [T]he fact that the Developer entity was reliant or soon would be reliant on discretionary prospective advances from lenders is a material fact that [MLP] and/or its agents were required to disclose to purchasers, owners and members of the AOAO Board at the Project.

Esaki Decl., Ex. G [Underlying Draft-COLs] at 19–22, Dkt. No. 65-7 at 74–77.

These Draft-COLs offer little in the way of "clarity" with respect to the scope of liability the Underlying Plaintiffs intended to impose on Churchill in the Underlying Lawsuit.

Liberty also argues that Churchill has essentially conceded that the Underlying Lawsuit does not impose liability on Churchill for his acts or omissions

made in any capacity other than as an AOAO director.  *See* Liberty Mem. in Supp.

at 11–13, 18–19, 22, Dkt. No. 62-3.  For example, in response to an interrogatory

in the instant matter, MLP stated: "It is MLP's understanding that Mr. Churchill is

receiving a defense in the Underlying Lawsuit under [the National Union Fire Ins.

Co. of Pittsburgh, Pa. policy number 01-189-15-54] with respect to Mr. Churchill's

capacity as director or officer of the [AOAO]."  Liberty Concise Statement in

Supp., Ex. A [MLP Interrogatory Response] at 10, Dkt. No. 63-1.  Moreover, in

response to a discovery request in the Underlying Lawsuit, Churchill filed a

document in Circuit Court on November 26, 2012, entitled "Defendant Ryan

Churchill's, *in his Capacity as Director of the [AOAO]*, Response to Pls.' First

Request for Production of Docs. & Things to Def. Ryan Churchill Dated Sept. 7,

2012."  Liberty Concise Statement in Supp., Ex. B-1 [Churchill Response to

Production Request] at 1, Dkt. No. 63-3 at 1 (emphasis added).  These statements

from the defendants in the Underlying Lawsuit are a better indication of what those

defendants wish, rather than indications of what the Underlying Plaintiffs intend.

The same is true of MLP's statements in its 2015 Form 10-K.  *See* Mem. in Opp'n

to Mot. to Remand, Ex. C [U.S. Secs. & Exch. Comm'n Form 10-K], Dkt. No. 16-

4 [hereinafter MLP Form 10-K].[6]

---

[6]Liberty argues that "MLP implicitly confirmed that Mr. Churchill was not sued in his capacity
as an officer or director of MLP in the Underlying Lawsuit when it stated in its 2015 Form 10-K
that '[MLP] has been named along with multiple parties in lawsuits filed by owners of units and

Thus, viewing these facts, and in light of the "potentiality" standard for triggering Liberty's duty to advance defense costs under the Policy, *Braden Partners*, 2017 WL 63019 at *10, the Court finds in favor of coverage, *Sentinel*, 875 P.2d at 904 ("All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured[.]"(quoting *Trizec Props.*, 767 F.2d at 812)).

C.     The "Outside Service Exclusion" (Exclusion 5.8) Does Not Apply

There are a number of exclusions from Liberty's coverage obligations under the Policy. Under the Policy's Outside Service Exclusion, for instance, Liberty

---

fractional interest in the project . . . .'" Liberty Mem. in Supp. at 13, Dkt. No. 62-3 (quoting MLP Form 10-K at 10, Dkt. No. 16-4). Liberty also asserts that "the 10-K does not state that Mr. Churchill is a defendant[,] [n]or, correspondingly, does it reference any indemnification or advancement of fees and costs by MLP to Mr. Churchill in his defense of the Underlying Lawsuit." Liberty Mem. in Supp. at 13, Dkt. No. 62-3. The rest of Item 3 of the MLP Form 10-K (entitled "Legal Proceedings") reads:

> The lawsuits allege deceptive acts, intentional misrepresentation, concealment, and negligent misrepresentation, among other allegations and seek unspecified damages, treble damages and other relief. [MLP] disagrees with the allegations and is defending itself. [MLP] is presently unable to estimate the amount, or range of amounts, of any probable liability, if any, related to this matter and no provision has been made in the accompanying financial statements.
>
> We are a party to various claims, complaints, and other legal actions that have arisen in the normal course of business from time to time. We believe the outcome of these pending legal proceedings, in the aggregate, is not likely to have a material adverse effect on our operations, financial position or cash flows.

MLP Form 10-K at 10, Dkt. No. 16-4. The language of the MLP Form 10-K might be suggestive of the defendants in the Underlying Lawsuit's interpretation of the Underlying SAC, but says nothing of the Underlying Plaintiffs' intention to pursue Churchill only in his capacity as an AOAO Director.

"shall not be liable to make any payment for Loss in connection with any Claim"

that is:

> based upon, arising from, or in any way related to an Insured Person serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the Insured Organization; provided that this exclusion shall not apply with respect to any coverage afforded under Section 2, Outside Position Liability.

Policy § 5.8, Dkt. No. 10-4 at 6. Thus, the Outside Service Exclusion broadly bars coverage for conduct when an MLP individual insured serves as a director or officer of another, uninsured entity. *See* Liberty Mem. in Supp. at 20, Dkt. No. 62-3. Liberty argues that this exclusion applies in the instant context both because the AOAO qualifies as a "board outside MLP" and because broad-form exclusions from insurance coverage are generally acceptable in the State of Hawai'i. Liberty Mem. in Supp. at 22, Dkt. No. 62-3 (citing, *inter alia*, *Trenches, Inc. v. Hanover Ins. Co.*, 575 Fed. Appx. 741 (9th Cir. 2014) (enforcing broadly worded exclusion containing "arising out of" language); *Cont'l Cas. Co. v. Adams*, 2003 WL 22162379, *9, *32–33 (M.D. Pa. Sept. 12, 2003)).

MLP advances a single reason why the Outside Service Exclusion should not apply—because the AOAO is MLP's "Subsidiary" under the terms of the Policy and is therefore itself an "Insured Organization" (like MLP).[7] MLP Opp'n

---

[7]MLP succinctly explains that the AOAO qualifies as a Subsidiary of an Insured Organization under the Policy because "MLP owns 100% of MLP KB Partner, LLC, which owns 51% of

at 27–31, Dkt. No. 69 (referring to Policy § 25.9, Dkt. No. 10-4 at 11).  Indeed,

during the December 15, 2017 hearing on the Cross-MSJs, counsel for MLP

agreed that if MLP does not "prevail on" its "subsidiary argument," then "[the

AOAO is] an outside entity," as argued by Liberty, "so [Churchill is] covered[,]

but only for indemnity at the end of the case."  Tr. of Hr'g at 16, Dkt. No. 76.

The Policy defines *Subsidiary*, in relevant part, as "any entity in which more

than 50% of the outstanding securities or voting rights representing the present

right to vote for election of directors or equivalent positions are owned, in any

combination, by one or more Insured Organization[.]"  Policy § 25.19, Dkt. No.

10-4 at 12.  MLP offers the evidentiary support linking MLP to the "ownership" of

the AOAO within the meaning of the Policy (*see* Esaki Decl., Ex. K [Kapalua Bay

Dev. Org. Chart], Dkt. No. 70-2; Esaki Decl., Ex. L [Decl. of Condo. Prop. Regime

of Kapalua Bay Condo.] § I(B)(44), Dkt. No. 70-3 at 5; Van Etten Decl., Ex. M

[AOAO Bylaws (Part 1)] Art. II, § 1, Dkt. No. 70-5 at 3), which is challenged by

Liberty in only one respect: Liberty claims that MLP's 51% ownership interest in

Kapalua Bay Holdings, LLC does not qualify Kapalua Bay Holdings as an MLP

*Subsidiary* and therefore breaks the ownership link between MLP and the AOAO

---

Kapalua Bay Holdings, LLC, which in turn owns 100% of Kapalua Bay, LLC[,]" and "Kapalua Bay, LLC owns more than 50% of the voting rights in the AOAO" due to its retention of voting rights for unsold condominiums.  MLP Opp'n at 29, Dkt. No. 69.

(Liberty Reply at 17, Dkt. No. 73-1).  The reasons cited by Liberty, however, cannot withstand scrutiny.

First, Liberty argues that because Kapalua Bay Holdings is a "member driven" LLC formed under the laws of the State of Delaware (Liberty Reply at 17, Dkt. No. 73-1 (citing Young Decl., Ex. G [MLP Ans. in Underlying Lawsuit] at ¶ 20, Dkt. No. 71-10 at 4)), MLP's 51% ownership does not represent a "controlling interest."  In fact, Liberty offers that MLP has admitted in an SEC filing that it "does not have a controlling interest in [Kapalua] Bay Holdings."  Liberty Reply at 18 (quoting Young Decl., Ex. H [U.S. Secs. & Exch. Comm'n Form 10-Q] § 9, Dkt. No. 71-11 at 10).  While that may be true, Liberty does not explain how "control" of Kapalua Bay Holdings is relevant in the instant context.  The Policy defines *Subsidiary* in terms of percentage ownership, not control.[8]  If Liberty wanted *Subsidiary* to depend on control or on any other factors not mentioned in the Policy, it presumably could have drafted its own contract in that manner.  But it did not.

Second, Liberty contends that MLP's ownership interest in Kapalua Bay Holdings cannot constitute ownership of at least 50% of its "outstanding securities" because "[t]he membership interests of member driven LLCs are not securities."  Liberty Reply at 17, Dkt. No. 73-1.  The only direct authority,

---

[8]Liberty does not contest MLP's percentage ownership of Kapalua Bay Holdings.

however, that Liberty cites in support of this proposition is a 2010 law firm blog that itself offers no authority in support of its conclusory statements. *See* Arina Shulga, *Are LP, GP, LLP, and LLC Interests Securities?*, Business Law Post (June 28, 2010), *available at* http://www.businesslawpost.com/2010/06/are-lp-gp-llp-and-llc-interests.html. The Court finds this far from sufficient to satisfy Liberty's burden of establishing application of the Outside Service Exclusion. *See C. Brewer & Co.*, 347 P.3d at 169 (citing *Retherford*, 470 P.2d 517).

Because Liberty's limited contentions do little to contravene MLP's submissions evidencing the AOAO's status as an MLP *Subsidiary* under the Policy (*see* Policy § 25.19, Dkt. No. 10-4 at 12), the Outside Service Exclusion does not protect Liberty from the contractual defense obligations it owes to Churchill.

## III. <u>MLP Coverage</u>

The Policy provides MLP with coverage for its own wrongful conduct occurring "as a result of a Securities Action." Policy § 1.3, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2–3. An action qualifies as a *Securities Action* under the Policy where it:

> (a)  arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Insured Organization, whether such purchase, sale, or offer involves a transaction with the Insured Organization or occurs in the open market;
>
> (b)  is brought by a securities holder of the Insured Organization other than a natural person who was, now is, or shall hereafter be a duly elected or appointed director or officer

30

of the Insured Organization based upon such securities holder's interest in such securities, whether directly or by class action; or

(c)    is brought as a securities holder derivative action on behalf of the Insured Organization.

Policy § 25.18, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10.  Liberty asserts that MLP is not entitled to *any* coverage in the Underlying Lawsuit because that lawsuit does not qualify as a *Securities Action* under the terms of the Policy. *See* Liberty Mem. in Supp. at 16–17, Dkt. No. 62-3.  In response, MLP argues that the Underlying Lawsuit qualifies as a *Securities Action* because it has been "brought by a securities holder of AOAO, against the subsidiary AOAO, and its Parent, MLP, both of which are Insured Organizations."  MLP Opp'n at 33, Dkt. No. 69.  In other words, MLP relies on Section 25.18(b) of the Policy.  MLP's assertion is unpersuasive.

Because "[t]he Policy does not provide any definition of 'securities holder,'" MLP encourages the Court to include the Underlying Plaintiffs in that definition because "Courts and other authorities have recognized that the nature of the relationship between a condominium owner and its Association is that of a corporation and shareholder or security holder[.]"  MLP Opp'n at 33–34, Dkt. No. 69 (citing Rohan & Reskin, 42 Real Estate Transactions: Condominium Law & Practice—Forms, § 42.01; *Sargis v. Seventy Grove Hill Condo. Ass'n*, 1990 WL 289578, *7–8 (Conn. Super. Ct. July 19, 1990); *Carlandia Corp. v. Rogers & Rod*

*Constr. Corp.*, 605 So.2d 1014, 1015 (Fla. Ct. App. 1992)).  Yet MLP provides no

binding authority in support of this contention, and perhaps more importantly, the

authority it cites is not persuasive.  The Underlying Plaintiffs are condominium

owners—not shareholders nor securities purchasers.  *See* Liberty Mem. in Supp. at

16–17, Dkt. No. 62-3.  Moreover, the owners' claims in the Underlying Lawsuit

are not based upon their interest in some nominal security they hold in the AOAO.

The claims are based on misrepresentations and omissions on the part of the

developers and others responsible for building and marketing the condominium.

As such, Section 25.18(b) of the Policy does not apply.

To qualify as a *Securities Action* under the Policy, the underlying claim must

involve the purchase or sale of securities, or it must be brought by securities

holders.  Policy § 25.18, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10.

The theory of the Underlying Lawsuit is that MLP, as a developer of the Project,

"hid the truth" and "misrepresented" the status of the Project, and its financial

state, among other things, thereby injuring the Underlying Plaintiffs.  *See* Liberty

Mem. in Supp. at 16, Dkt. No. 62-3 (citing *Impac*, 634 Fed. Appx. at 615

(affirming coverage denial due to lack of underlying securities claim against

insured entity)).  The Court agrees with Liberty that such a theory necessarily

prevents characterization of the Underlying Lawsuit as an action "aris[ing] from

the purchase or sale of, or offer to purchase or sell, any securities issued by the

Insured Organization[.]"  Policy § 25.18(a), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10.[9]

As such, the Underlying Lawsuit cannot be a *Securities Action* under the Policy.

<u>**CONCLUSION**</u>

For the above-stated reasons, Liberty's Motion for Summary Judgment (Dkt. No. 62) and MLP's Motion for Partial Summary Judgment (Dkt. No. 64) are GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED: April 3, 2018 at Honolulu, Hawai'i



_____
Derrick K. Watson
United States District Judge

---

*Maui Land & Pineapple Co., Inc. v. Liberty Insurance Underwriters Inc., et al.*, CIV. NO. 16-00271 DKW-KJM, **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT LIBERTY INSURANCE UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF MAUI LAND & PINEAPPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

[9]For similar reasons, Section 25.18(a) would not apply, even were MLP to argue for its application.